IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

STEPHEN P. WALLACE,           )
                              )
     Plaintiff,               )
                              )
           v.                 )   Case No. 1:16-cv-0047
                              )
JOHN BAYLOUNY, *ET AL.*,      )
                              )
     Defendants.              )

## M E M O R A N D U M   O P I N I O N

This matter is before the Court on Defendants' motion to dismiss *pro se* Plaintiff Stephen P. Wallace's Complaint for failure to state a claim.  (Mot. to Dismiss [Dkt. 5]; Mem. in Supp. [Dkt. 6].)  Wallace failed to appear at the May 26, 2016 hearing on this motion as ordered and he has not since explained his absence.  The Court granted Defendants' motion to dismiss without prejudice at the hearing.  This Memorandum Opinion elaborates on the Court's reasoning.

### I.        Background

In 2012, an Arkansas corporation named Vision Technologies, Inc. ("Vision") authorized Wallace to act as its agent to procure investors.  (Origination Fee Contract [Dkt. 1-1] at 2.)  Wallace drafted a document entitled "Origination Fee Contract," which memorializes the agreement.  (*Id.*)  The Origination Fee Contract authorizes Wallace and Eric Peterson to

1

"'procure & originate [Ready, Willing & Able INVESTORS], whether Corporate or Individuals, solely acceptable to CLIENT, to acquire, JV, merge, & finance CLIENT via 'bona fide Negotiations.'"  (*Id.* (formatting in original).)  If Wallace or Peterson procured an "Acceptable Transaction," Vision agreed to pay each agent an origination fee of three percent of "any & all FINANCIAL and/or EQUITY 'infusion.'"  (*Id.* (formatting in original).)  Vision President and CEO Robert Lee Thompson and witness James Torraco signed the document on June 18, 2012. (*Id.*)

Wallace alleges that in October 2012 he "successfully did procure" an unspecified investment from Virginia-based defense contractor, DRS Technologies ("DRS").  (Compl. at 4.)[1] Wallace describes his dealings with DRS as follows.  On September 12, 2012, DRS Vice President John Baylouny ("Baylouny") emailed Vision's CEO to arrange a meeting to discuss the possibility of business dealings between DRS and Vision.  (Compl. Ex. [Dkt. 1-1] at 6.)  Wallace was copied on that email.  (*Id.*)  In a second email, Baylouny invited several

---

[1]     Wallace's Complaint purports to "re-allege[] and adopt[]" allegations contained in a petition he filed in Arkansas state court.  (*See* Compl. at 2.)  The Court viewed the factual allegations in the Arkansas petition as if alleged in the present case.  The legal claims asserted in the Arkansas petition, however, relate to a business and individuals who are not parties in this lawsuit.  Accordingly, those claims are not properly before this Court and are not considered herein.

people to attend a business development meeting between Vision and DRS, including Vision CEO Thompson, Wallace, DRS corporate counsel Matt Weingast ("Weingast"), and other DRS employees. (Compl. Ex. at 7.)  The email provided instructions for attending by phone or internet connection.  (*Id.*)  Wallace did not attend the October 8, 2016 meeting or participate by phone or internet.  (*See* Compl. at 3.)

At the meeting, Defendants Baylouny and Weingast from DRS met with Vision CEO Thompson.  (Comp. Ex. at 4.)  The two companies entered into a nondisclosure agreement.  (Compl. Ex. 19; Compl. ¶ 9.)  Wallace has not seen the nondisclosure agreement and does not know the specifics of its contents.  He alleges that the nondisclosure agreement is a "sham" that Vision imposed upon DRS to "covertly induce[] Defendants to tortiously interfere" with his Origination Fee Contract and the nondisclosure agreement is shielding an unspecified business transaction between Vision and DRS.  (Compl. ¶ 9.)

Three days after the meeting, Wallace informed DRS Vice President Baylouny of the Origination Fee Contract between Wallace and Vision.  (*See* Compl. Ex. at 9.)  Wallace requested that his Origination Fee Contract be attached to any future contracts and that Baylouny send copies of "confidential intercompany transactions" to him and his co-agent Peterson. (Compl. Ex. at 8.)  Wallace has not since received a copy of any

nondisclosure agreement or document memorializing business dealings between Vision and DRS.  None-the-less, Wallace alleges that DRS has done business with Vision in some way and that he was the "sole procuring cause" of that business, entitling him to his origination fee.  (Compl. at ¶ 8, 4.)

On October 22, 2012, Wallace and co-agent Peterson sought to enforce their Origination Fee Contract by entering into arbitration proceedings with Vision and Vision CEO Thompson.  (Compl. Ex. at 9.)  The precise outcome of that proceeding is unknown, but Wallace indicates in an email that he did not prevail in the arbitration.  (Compl. Ex. at 18 (Wallace stating in a letter that "Thompson has exhausted & tortuously thwarted All our Remedy @ the American Arbitration Association" (formatting in original)).)

After the arbitration proceeding was completed, Wallace sent a letter to Baylouny, who was then still a vice president at DRS.  (Compl. Ex. at 18.)  This June 2014 letter explained Wallace's belief that Vision had violated the terms of his Origination Fee Contract.  (*Id.*)  Wallace requested that Baylouny "cooperate" by sending all documents relating to any business dealings between Vision and DRS, so as to avoid the need for Wallace to file a lawsuit.  (*Id.*)  Baylouny responded with an email stating, "As I recall this interaction consisted of an NDA execution and one meeting.  To my knowledge there was

4

no further dialog, nor was there any business transacted.  I

believe that there is no material documentation available to

help your case from my side."  (Compl. Ex. at 19.)[2]  Baylouny

referred any future questions to DRS corporate counsel Weingast.

(*Id.*)

In April 2015, Wallace emailed Weingast the same day asking for

confirmation "for the record" that DRS and Vision had not

entered into any "joint alliance/bidding agreements."  (*Id.*)

Weingast never responded to the email.  (Compl. ¶ 7.)  Wallace

construes this silence as affirmation that some business

dealings did occur.  (Compl. ¶ 7.)

In April 2015, Wallace filed suit in Arkansas state

court against Vision, Vision CEO Thompson, and co-agent Peterson

for breach of the Origination Fee Contract and wrongful

termination.  (*See* Compl. 4-6.)  The Circuit Court of Benton

County, Arkansas dismissed the petition without prejudice on

August 7, 2015, after finding Wallace's petition "deficient in

all respects as to claims he attempts to assert."  *Wallace v.*

---

[2]     When reading this email attached to Plaintiff's
Complaint, the Court does not accept Defendant Baylouny's
statements contained therein as true.  *See Goines v. Valley
Cmty. Servs. Bd.*, --F.3d--, 2016 WL 2621262, at *5 (4th Cir.
2016) ("[I]n cases where the plaintiff attaches or incorporates
a document for purposes other than the truthfulness of the
document, it is inappropriate to treat the contents of that
document as true.").

*Vision Tech., Inc.*, No. CV-15-558-6 (Ark. Cir. Ct. Aug. 7, 2015).[3]

Wallace filed the present Complaint in January 2016 against DRS Vice President Baylouny, DRS corporate counsel Weingast, and former DRS CEO William Lynn III ("Lynn").  The Complaint alleges tortious interference with contract and civil conspiracy to interfere with contract.[4]  (Compl. at 2.)  As a remedy, Wallace seeks a declaratory judgment and order for Defendants to produce "Any & All JV Bidding Contracts" between DRS and Vision after September 11, 2012.  (Compl. at 3.)  Wallace also seeks an order requiring Defendants to sign affidavits declaring that DRS will deduct his origination fee from any payments it makes to Vision.  Lastly, Wallace seeks payment of the origination fee he alleges he is owed.

In February 2016, Defendants moved to dismiss the Complaint for failure to state a claim.  (Defs.' Mem. in Supp.

---

[3]     No Defendant in this case argued that the Arkansas court's dismissal has preclusive effect in the proceeding before this Court.  Accordingly, this Memorandum Opinion does not consider that issue.

[4]     The Complaint labels Count Two as "conspiracy to circumvent plaintiffs [sic] beneficial interest."  In light of the first count, Defendants construed Count Two as a claim of civil conspiracy to interfere with contract.  Wallace did not object to this characterization.  Accordingly, the Court will liberally construe the Complaint in Wallace's favor by interpreting Count Two as a claim of civil conspiracy to interfere with contract.

[Dkt. 6].)[5]   Wallace filed a memorandum and exhibits in opposition on March 9, 2016.  (Mem. in Opp'n [Dkt. 12].)  Defendants replied on March 14, 2016.  (Reply [Dkt. 13].)

On March 29, 2016, the Court granted a motion from Wallace to stay the case to permit him time to retain counsel.  (*See* Stay Order [Dkt. 16].)  Five weeks into the six-week stay, Wallace filed a motion to disqualify the undersigned Judge, to vacate the order granting his stay, and to grant a new stay because the previous order granting his stay was prejudicial to him.  (*See* Vacate Motion [Dkt. 17].)  Six days later, Wallace failed to appear at a previously scheduled status conference.  (*See* Minute Entry [Dkt. 18].)  Thereafter, the Court issued a memorandum opinion denying Wallace's motions to disqualify, vacate, and stay.  *See Wallace v. Baylouny*, No. 1:16-cv-47, 2016 WL 2868865 (E.D. Va. May 17, 2016).[6]  The Court then returned the case to active status.

---

[5]   Defendants' motion to dismiss included the notice required by *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975) and Local Rule 7(K).  (*See* Motion and Notice [Dkt. 5].)
[6]   Wallace also filed a petition for writ of mandamus to the Court of Appeals for the Fourth Circuit under the Crime Victims' Rights Act, 18 U.S.C. § 3771, arguing that this Court's recitation of facts and law in the Order granting Wallace a stay criminally victimized him.  *See In re Wallace*, No. 16-1564 (4th Cir. May 19, 2016).  The Fourth Circuit denied the writ and noted that Wallace "failed to present grounds requiring the district judge to disqualify himself or grant the other relief requested."  *Id.* at 3.

On May 26, 2016, the Court held a hearing on Defendants' motion to dismiss.  Wallace failed to appear as ordered at the May 26, 2016 hearing.  The Court then dismissed Wallace's Complaint without prejudice.  This Memorandum Opinion expands upon the Court's reasoning.

## II.        Standard of Review

"The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of a complaint; importantly, [it] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Butler v. United States*, 702 F.3d 749, 752 (4th Cir. 2012) (citations and internal quotation marks omitted).  A court reviewing a complaint on a Rule 12(b)(6) motion "must accept as true all of the factual allegations contained in the complaint," and draw "all reasonable inferences" in the plaintiff's favor.  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted).  However, the court need not accept as true legal conclusions disguised as factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679-81 (2009).  Thus, the Court need not accept as true "naked assertions" or "unadorned conclusory allegations" devoid of "factual enhancement."  *Vitol, S.A. v. Primerose Shipping Co. Ltd*, 708 F.3d 527, 543 (4th Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  The court also need not

assume the veracity of "labels and conclusions," *Iqbal*, 556 U.S. at 678, or legal conclusions drawn from the facts alleged, *Adcock v. Freightliner LLC*, 550 F.3d 369, 374 (4th Cir. 2008).

To survive a motion to dismiss, the complaint must contain sufficient factual allegations, taken as true, "to raise a right to relief above the speculative level" and "nudge[] [the] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). This standard obligates the plaintiff to provide "more than labels and conclusions and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Instead, sufficient pleading requires "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 554 (4th Cir. 2013).

Because a motion to dismiss tests the sufficiency of the complaint, the court's evaluation is "generally limited to a review of the allegations in the complaint itself." *Goines v. Valley Cmty. Servs. Bd.*, --F.3d--, 2016 WL 2621262, at *3 (4th Cir. 2016). However, the court may also consider a document incorporated into the complaint by reference, a document attached to the complaint as an exhibit, and "a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was

integral to the complaint and there is no dispute about the document's authenticity." *Id.;* Fed. R. Civ. P. 10(c).

In the event of a conflict between the bare allegations of the complaint and any exhibit attached to the complaint pursuant to Federal Rule of Civil Procedure 10(c), the exhibit prevails. *Fayetteville Inv'r v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991).  Accordingly, "[w]hen the plaintiff attaches or incorporates a document upon which the claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 2016 WL 2621262, at *5.  The court must exercise caution when applying the exhibit-prevails rule because "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

### III.    Analysis

Because Wallace brings this case under the Court's diversity jurisdiction,[7] the Court must first determine which

---

[7]    Diversity of citizenship exists because Wallace is a citizen of Illinois and all Defendants are citizens of Virginia. (*See* Compl. ¶¶ 1-4.)  Furthermore, it does not appear to a legal certainty that the claim is really for less than the jurisdictional amount.  *See St. Paul Mercy Indemn. Co. v. Red*

state's law to apply.  When exercising diversity jurisdiction, this Court employs Virginia's choice-of-law rules.  *Insteel Indus., Inc. v. Costanza Contracting Co.*, 276 F. Supp. 2d 479, 483 (E.D. Va. 2003) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)).  Wallace's complaint alleges two business torts: (1) tortious interference with contract, and (2) civil conspiracy to interfere with contract.  Virginia "applies the *lex loci delicti*, the law of the place of the wrong, to tort actions."  *Milton v. IIT Research Inst.*, 138 F.3d 519, 521 (4th Cir. 1998).  "Under Virginia law, the place of the wrong is the place the last event necessary to make an [actor] liable for an alleged tort takes place."  *Gen. Assur. of Am., Inc. v. Overby-Seawell Co.*, 533 F. App'x 200, 206 (4th Cir. 2013).  For claims of tortious interference with contract and business conspiracies, the last event necessary to establish liability is the occurrence of the plaintiff's injury.  *See Ford Motor Co. v. Nat'l Indem. Co.*, 972 F. Supp. 2d. 850, 856, 860 (E.D. Va. 2013).  And when the injury alleged is the denial of a plaintiff's contractual proceeds, the place of intended payment and performance of the contract establish the place of the wrong.  *See id.* at 859-60 ("When the essence of a contract is the making of a specified payment contingent upon the occurrence

---

*Cab Co.*, 303 U.S. 283, 288-89 (1938).  Accordingly, diversity jurisdiction is proper pursuant to 28 U.S.C. 1332(a).

of certain independent events . . . it is logical that the place of intended payment and performance should be held to be the location of the event giving rise to liability for tortious interference with the contract requiring that payment.")

In this case, the ultimate injury that Wallace alleges is Vision's failure to pay his contractual origination fee. It appears that such payment would have tendered from Arkansas, as Vision is headquartered in Arkansas and Wallace was originally introduced to Vision at its Arkansas offices. (Origination Fee Contract; Compl. Ex. at 8.) Accordingly, the Court will apply Arkansas law to Wallace's Complaint.[8]

Before considering the sufficiency of Wallace's pleadings, the Court must identify the allegations in the complaint that are bare legal conclusions, naked assertions, or labels that are not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 680. Much of the complaint suffers this defect, including the following allegations (formatting from

---

[8]     The choice-of-law analysis is a minor concern in this case. The Fourth Circuit recognizes that "choice-of-law analysis becomes necessary . . . only if the relevant laws of the different states lead to different outcomes." *Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 101 (4th Cir. 2013). Defendants argued in their memorandum in support of dismissal that the laws of Virginia, Arkansas, and Florida are indistinguishable as they relate to Wallace's Complaint. Wallace did not object to this statement, did not identify any difference in the laws of those states, and did not otherwise argue which law should apply.

Complaint): Defendants "acted in covert collusion to 'Tortuously
Interfere & Circumvent'" Wallace's contract rights (Compl. at
1); "DEFENDANTS and [VTI Principals], et al., have covertly
conspired in collusion to 'Tortuously Interfere & Circumvent'
PLAINTIFFS '*Rights Granted Under the CONTRACT*'" (Compl. ¶ 6);
"That PLAINTIFF is due his Perpetual (6%) Over-riding Royalty
"...*on any & all FINANCIAL and/or EQUITY 'infusion...",* as the
'*SOLE PROCURING CAUSE*'"; (Compl. ¶ 8); "That VISION TECHNOLOGIES
and Robert Lee Thompson have 'covertly induced Defendants to
tortuously interfere' with Plaintiffs CONTRACT via a 'sham NDA'
. . . which Defendants colluded with [VTI] to assert" (Compl.
¶ 9); "VTI and its Officers, Lee Thompson & Lee Torroco,
intentionally, with malice & forethought, breached every
Covenant of the CONTRACT" (Compl. at 5); and "Lee Thompson,
James Torroco, John Baylouny & Matt Weingast, have intentionally
refused to cooperate voluntarily" (Compl. at 5).  These
allegations, and others that are not material to this motion,
fall squarely into the category of legal conclusions and bare
assertions devoid of factual enhancement that the U.S. Supreme
Court in *Twombly* and *Iqbal* concluded need not be accepted as
true in a motion to dismiss.  *See Iqbal*, 556 U.S. at 680-81;
*Twombly*, 550 U.S. at 554-55.  Looking to only the facts alleged
in the Complaint and attached exhibits, Wallace does not

plausibly plead a claim of tortious interference or civil conspiracy.

As an initial dispositive point as to all claims and all Defendants, Wallace fails to sufficiently plead that Vision breached its contract with him.  Wallace must allege Vision's breach in order to sustain his tortious interference claim, which requires an allegation that Defendants' improper interference caused a third party to breach its contract and that Defendants' conduct caused damage to Wallace.  *See Palmer v. Ark. Council on Econ. Educ.*, 40 S.W.3d 784, 791 (Ark. 2001).  Similarly, Wallace relies on Vision's breach of its contractual obligation as the basis of damages in his civil conspiracy claim.  *See Faulkner v. Ark. Children's Hosp.*, 69 S.W.3d 393, 406 (Ark. 2002) ("A civil conspiracy is not actionable in and of itself, but a recovery may be had for damages caused by acts committed pursuant to the conspiracy.")  Assuming, without deciding, that a valid contract exists between Vision and Wallace, the Complaint fails in several ways to plead Vision's obligation to make a payment under that Contract and breach by failing to make that payment.

First, Wallace does not plausibly plead that he procured and originated DRS as a potential investor.  The Contract obligates Vision to pay a fee only if Wallace or Peterson "procure[s] and originate[s]" a ready, willing, and

14

able investor that enters into an "acceptable transaction" of financial "infusion" into Vision.  (Origination Fee Contract). The Court can glean from the documents attached to the Complaint that Wallace was copied on one email and one meeting invitation from DRS personnel to Vision's CEO.  Wallace did not attend the meeting and there are no other indications of Wallace's efforts to establish a business relationship with DRS.  Those minimal facts fail to sufficiently allege that Wallace procured and originated DRS as an investor.

Second, Wallace does not plausibly plead that Vision's dealings with DRS triggered Vision's obligation to pay Wallace any origination fee.  The Contract requires Vision to pay Wallace three percent "on any & all FINANCIAL and/or EQUITY 'infusion.'"  (Origination Fee Contract (formatting in original).)  It is entirely unclear from the Complaint what, if any, financial or equity infusion DRS contributed to Vision.

The above pleading deficiencies require the dismissal of all of Wallace's claims.  By failing to plead conditions precedent to Vision's obligation to pay Wallace, there is no basis to conclude Vision breached the Contract by not paying Wallace.  Consequently, the Court will dismiss all claims in the Complaint as to all Defendants.

Even if Wallace does adequately allege that Vision breached its contract with Wallace, the facts alleged as to each

15

individual Defendant are also insufficient to state any claim of tortious interference with contract or conspiracy to interfere with contract.

A.        Tortious Interference with Contract[9]

The Court will grant Defendants' motion to dismiss Wallace's tortious interference with contract claim under Federal Rule 12(b)(6) because Wallace fails to sufficiently plead facts to support such a claim.

Under Arkansas law, a plaintiff alleging tortious interference with contract must establish the following: "(1) the existence of a valid contractual relationship; (2) knowledge of the relationship on the part of the third party; (3) intentional and improper interference by that third party inducing or causing a breach or termination of the relationship; and (4) resulting damage to the plaintiff." *Schueller v. Goddard*, 631 F.3d 460, 463 (8th Cir. 2011) (quoting *Palmer v. Ark. Council on Econ. Educ.*, 40 S.W.3d 784, 791 (Ark. 2001)). "[A] successful claim for interference with a contractual relation must allege and prove that a third person did not enter

---

[9]        No Defendant argued that Arkansas's three-year statute of limitations should bar Wallace's Complaint. *See* Ark. Code Ann. § 16-56-105; *Roach Mfg. Corp. v. Northstar Indus., Inc.*, 630 F. Supp. 2d 1004, 1007 (E.D. Ark. 2009) ("The statute of limitations for intentional interference with a contractual relationship or business expectancy, fraud, and unjust enrichment is also three years."). Accordingly, this Memorandum Opinion does not address that issue.

into or failed to continue a contractual relationship with the claimant as a result of the unauthorized conduct of the defendant." *Id.* (quoting *Palmer*, 40 S.W.3d at 791).

Applying that law to the facts alleged as to each Defendant demonstrates that Wallace fails to plead a claim of tortious interference with contract.

### 1.     Defendant William Lynn III

The Complaint and attached exhibits do not include a single factual allegation regarding Defendant Lynn's tortious conduct.  The Court was able to deduce from one exhibit that Lynn was the CEO of DRS in 2012.  (Compl. Ex. at 5.)  Beyond that basic information, there are no factual allegations pertaining to Defendant Lynn.  Accordingly, Wallace has failed to plausibly plead any of the elements of a tortious interference claim against Lynn.  The Court will dismiss that claim.

### 2.     Defendant Matt Weingast

The Complaint also fails to adequately plead a claim of tortious interference with contract against DRS corporate counsel Weingast for several reasons.  First, the Complaint provides insufficient facts to conclude under Arkansas's fact-intensive inquiry that Weingast engaged in "improper"

interference.[10]   The only facts relating to Weingast are that he
was in attendance at the October 8, 2012 meeting between Vision
and DRS and that he did not respond to an email from Wallace in
June 2014 asking Weingast to certify that no business
relationship exists between the two companies.   Neither
attending a meeting nor failing to respond to an email is
inherently improper and Wallace provides insufficient facts to
plausibly conclude that those actions are improper in this case.

Second, there is no allegation that Weingast had
actual knowledge of the Origination Fee Contract before
committing any improper interference.   *See Fisher v. Jones*, 844
S.W.2d 954, 957 (Ark. 1993) (affirming summary judgment for
tortious interference defendant because defendant learned of
contract three days after alleged improper conduct).   An exhibit
attached to the Complaint demonstrates that Wallace informed
Weingast of the Origination Fee Contract in a June 2014 email.
(*See* Compl. Ex. at 18-19; Compl. ¶ 9.)   By that time, however,
Wallace had already concluded arbitration proceedings against

---

[10]      Facts that Arkansas courts have considered include:
"(a) the nature of the actor's conduct, (b) the actor's motive;
(c) the interests of the other with which the actor's conduct
interferes, (d) the interests sought to be advanced by the
actor, (e) the social interests in protecting the freedom of
action of the actor and the contractual interests of the other,
(f) the proximity or remoteness of the actor's conduct to the
interference and the relations between the parties." *Baptist
Health v. Murphy*, 373 S.W.3d 269, 282 (Ark. 2010).

Vision for alleged breach of contract.  In other words, Vision's alleged breach predated Weingast's knowledge of the Origination Fee Contract.  Accordingly, the Court must dismiss the claim against Weingast for lack of actual knowledge.

Third, Wallace does not allege facts demonstrating Weingast had the requisite intent to interfere with the Origination Fee Contract.  The "defendant must have either desired to bring about the harm to plaintiff or have known that this result was substantially certain to be produced by his conduct."  *Stewart Title Guar. Co. v. Am. Abstract & Title Co.*, 215 S.W.3d 596, 606 (Ark. 2005).  The allegation that Weingast was present at a meeting and failed to respond to an email twenty months later does not satisfy either of these bases for demonstrating intent.

In sum, Wallace's claim of tortious interference with contract must fail with respect to Defendant Weingast because Wallace does not sufficiently plead: (1) Vision breached its Origination Fee Contract; (2) Weingast improperly interfered; (3) Weingast had actual knowledge of the Contract; and (4) Weingast had the requisite intent.

### 3.    Defendant John Baylouny

Wallace does not adequately alleged tortious interference with contract with respect to DRS Vice President Baylouny for several reasons.  First, there are insufficient

19

factual allegations that Baylouny engaged in any improper interference.  The only allegations of Baylouny's conduct are that he sent an email to Vision's CEO discussing a potential business meeting, he then invited Vision's CEO and Wallace to that meeting, and during the meeting Vision and DRS entered into a nondisclosure agreement and some form of business relationship.  Even viewing these facts in the light most favorable to Wallace, there are insufficient allegations that these interactions constitute improper interference with Wallace's contract rights.

Second, there are no factual allegations that Baylouny knew of the Origination Fee Contract before engaging in any communication with Vision.  Wallace first informed Baylouny of the Origination Fee Contract on October 11, 2012, three days after Baylouny's business meeting with Vision.  (*See* Compl. Ex. at 8, 18-19.)  There are no allegations that Baylouny took any actions regarding Vision after October 8, 2012.  Accordingly, the Court must dismiss the claim against Baylouny for failure to plead that he had actual knowledge of the contract before engaging in any improper interference.

Third, Wallace does not plausibly plead that Baylouny had the intent to interfere with Wallace's Origination Fee Contract.  None of the facts alleged regarding Baylouny plausibly demonstrate that he intended to interfere with

20

Wallace's contract, which was unknown to Baylouny until after the meeting with Vision.

In sum, Wallace fails to plausibly plead the following necessary elements of the tortious interference claim as to Defendant Baylouny: (1) Vision breached the Origination Fee Contract; (2) Baylouny improperly interfered; (3) Baylouny had actual knowledge of the Contract before improperly interfering; and (4) Baylouny had the requisite intent.  Accordingly, the Court will dismiss the tortious interference claim against Defendant Baylouny.

B.        Civil Conspiracy to Tortiously Interfere with Contract

The Court will also grant Defendants' motion to dismiss Wallace's claims of civil conspiracy to interfere with contract under Federal Rule 12(b)(6) because Wallace fails to sufficiently plead facts to support such a claim.

Under Arkansas law, a claim of civil conspiracy requires a plaintiff to prove "a combination of two or more persons to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive or immoral, by unlawful, oppressive or immoral means, to the injury of another." *Chambers v. Stern*, 64 S.W.3d 737, 743 (Ark. 2002).  Civil conspiracy is an intentional tort requiring a specific intent to accomplish the contemplated wrong.  *Id.*  "Allegations of a conspiracy 'must be pleaded with

21

sufficient specificity and factual support to suggest a 'meeting of the minds.'" *Williams v. Stewart*, No. 2:10cv00039, 2010 WL 4509829, at *3 (E.D. Ark. Aug. 25, 2010) (quoting *Deck v. Leftridge*, 771 F.2d 1168, 1170 (8th Cir. 1985)).  Bare allegations and rank speculation will not suffice.  *Id.* (citing *Mahaney v. Warren Cty.*, 206 F.3d 770, 772 (8th Cir. 2000)). Furthermore, "civil conspiracy is not actionable in and of itself, but a recovery may be had for damages caused by acts committed pursuant to the conspiracy."  *Faulkner v. Ark. Children's Hosp.*, 69 S.W.3d 393, 406 (Ark. 2002).

 As an initial point, the Court notes that Wallace may not plead a claim of conspiracy amongst only the three named Defendants.  It is well-recognized that, because "a corporate entity cannot conspire with itself, a civil conspiracy is not legally possible where a corporation and its alleged co-conspirators are not separate entities."  *Dodson v. Allstate Ins. Co.*, 47 S.W.3d 866, 876 (Ark. 2001).  Accordingly, "[c]orporate agents may not be held liable for civil conspiracy in the absence of evidence showing that they were acting for their own personal benefit rather than for the benefit of the corporation."  *Id.*  Defendants in this case were all corporate agents of DRS at the time of the acts giving rise to these claims.  The Complaint makes no allegations that any Defendant acted for personal benefit.  Accordingly, to succeed on his

conspiracy claims, Wallace must allege interactions between one or more Defendants and at least one non-DRS employee.

The only allegations of a Defendant communicating with a non-DRS employee (other than Wallace) are as follows: (1) Baylouny sent an email to Vision's CEO in September 2012 referencing a prior conversation and discussing a potential business development meeting; (2) Baylouny invited Vision's CEO to attend a business development meeting; (3) Baylouny and Weingast meet with Vision's CEO at a meeting on October 8, 2012; and (4) during the meeting Vision and DRS entered into a nondisclosure agreement and an unspecified business relationship.

It would be unsupported rank speculation to conclude that the above communications plausibly plead a meeting of the minds between Defendants and Vision's CEO to enter into a conspiracy to deprive Wallace of his contractual rights. There is no indication that any Defendant knew of the Origination Fee Contract before the above communications occurred and no allegation justifying the conclusion that any Defendant had the intent to interfere with Wallace's contract. Furthermore, as described above, Wallace has not adequately alleged how any conspiracy caused him injury because he fails to plead that Vision had any obligation under the Contract to pay Wallace.

23

Accordingly, the Court will dismiss the civil conspiracy claim as to all Defendants.

### IV.        Conclusion

For the foregoing reasons, the Court will grant Defendants' motion to dismiss without prejudice.  The Court will grant Plaintiff leave to amend his Complaint, if at all, no later than fourteen (14) days of the entry of the accompanying Order.[11]  If Plaintiff fails to amend within fourteen (14) days, the Court will DISMISS WITH PREJUDICE.

An appropriate order will issue.

_____
                              /s/
May  31, 2016                 James C. Cacheris
Alexandria, Virginia    UNITED STATES DISTRICT COURT JUDGE

_____

[11]        "An order granting leave to amend is interlocutory as it leaves the case open for either amendment of the complaint or entry of final judgment."  *Harper v. United Servs. Auto. Ass'n*, 322 F. App'x, 302, 2009 WL 1041440, at *1 (4th Cir. 2009).